UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PECH SOK,<br><br>        Petitioner,<br><br>    v.<br><br>SANDRA PENNYWELL,<br><br>        Respondent. | Case No.: 1:13-cv-00935-DAD-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

      In 2010, a jury convicted Petitioner of first degree murder. (Doc. 21, Ex. A, p. 30) The Fresno County Superior Court sentenced him to Petitioner an indeterminate sentence of twenty-six-years-to-life. In this action, Petitioner asserts his conviction should be reversed because police failed to give him his <u>Miranda</u> warnings in a manner he could understand and that the trial court erred in ordering a third competency evaluation.

**I.    PROCEDURAL HISTORY**

      After his 2010 conviction, Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed. (Doc. 21, Ex. A). Petitioner then filed a petition for review that was denied by the California Supreme Court. (Lodged Document ("LD") 20).

      Petitioner next filed an unsuccessful state habeas petition in the Fresno County Superior Court. (LD 21; 22). His habeas petitions filed in the 5th DCA and the California Supreme Court were

likewise unsuccessful.  (LD 24, 26).

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

On October 1, 2008, appellant Pech Sok went to his stepdaughter's apartment, where Boeun Say, his wife of less than two years, was staying. Appellant found Boeun Say in the kitchen and started arguing with her. He repeatedly asked her to come home with him, but she refused. After several minutes of arguing, appellant pulled out a knife and stabbed Boeun Say twice in the chest, inflicting a fatal wound to her heart. Boeun Say's young granddaughter, who witnessed the stabbing from the living room, went onto the balcony and called for help. Appellant was quickly restrained by other members of Boeun Say's family and taken into police custody. The next morning, appellant was interviewed by a police detective with the assistance of a Cambodian-speaking police officer. Appellant confessed in Cambodian to stabbing and killing Boeun Say and explained his reasons for doing so, which centered on her refusal to return to his home, the belief she was cheating on him, and the shame he felt of having a wife cheat on him at his age. Among other things, appellant told police it had been his "plan" to kill Boeun Say and then himself, but her children ran in and held him down before he could stab himself.

In September 2009, a jury found appellant competent to stand trial. In March 2010, he was convicted, in a separate jury trial, of first degree murder with a finding that he personally used a knife in the commission of the offense (Pen.Code,1 §§ 187, subd .(a), 12022, subd. (b)(1)). The trial court sentenced appellant to prison for 25 years to life for the murder, plus one year for the knife-use enhancement.

On appeal, appellant raises several claims of error concerning the issue of his competency to stand trial. He also contends the trial court erred in denying his pretrial motion to suppress his confession because the police officer's Cambodian translation of the standard <u>Miranda</u> warnings was inadequate. Appellant further contends that during closing rebuttal, the prosecutor improperly commented on his failure to testify at trial. Finally, appellant contends the judgment must be reversed because of alleged irregularities in the manner in which the trial court took the verdict and polled the jury. We reject appellant's contentions and affirm the judgment.

(Doc. 21, Exh. A, p. 30).

## II. DISCUSSION

A. <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. Legal Standard of Review

A court will not grant a petition for writ of habeas corpus under 28 U.S.C. § 2254(d) unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court

"must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III.      Review of Petitioner's Claims**

Petitioner claims: (1) the police violated Petitioner's Fifth Amendment right against self-incrimination by failing to advise him of his Miranda rights in a manner which he could understand; and (2) after two experts found Petitioner incompetent to stand trial, the trial court erred in sua sponte ordering an evaluation by a third expert, who found Petitioner competent.

///

A. Miranda Violation

Petitioner contends that the officers who took his statement improperly advised him of his rights against self-incrimination. This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's contention as follows:

Appellant claims the trial court erred in denying his motion to suppress his police confession because it was taken in violation of Miranda, supra, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**A. Procedural Background**

Before trial, appellant moved to suppress his confession on the ground it was taken in violation of Miranda. At the suppression hearing, the trial court received an English translation of appellant's police interview, which shows Officer Kim translated the warnings and appellant answered in Cambodian as follows:

"[DETECTIVE HERNANDEZ]: Okay, okay. I'm going to talk to you, like I said, while you're in custody. But before I do that I need to advise you of your rights, okay.

"[OFFICER KIM]: He'll talk to you about the reason why you got arrested. Before he asks you, he'll read you your rights because in America people have rights. So listen to him.

"[APPELLANT]: Yes.

"[DETECTIVE HERNANDEZ]: You have the right to remain silent.

"[OFFICER KIM]: About this incident, if you don't want to talk about it it [']s okay.

"[APPELLANT]: Yes.

"[DETECTIVE HERNANDEZ]: Anything you say can and will be used against you in a court of law.

"[OFFICER KIM]: The story that you tell us today can be shown to the court.

"[APPELLANT]: Yes.

"[DETECTIVE HERNANDEZ]: You have the right to talk to a lawyer and have him present with you while you're being questioned.

"[OFFICER KIM]: If you want to have an attorney to be with you, you can.

"[APPELLANT]: Yes.

"[DETECTIVE HERNANDEZ]: If you cannot afford to hire a lawyer one will be appointed to represent you before any questions if you wish.

"[OFFICER KIM]: If you don't have any money to pay for an attorney they'll get one to

> speak with you.
>
> "[APPELLANT]: I don't have any money to pay.
>
> "[OFFICER KIM]: Wait.
>
> "[DETECTIVE HERNANDEZ]: You can decide any time to exercise these rights and not answer any questions or make any statements.
>
> "[OFFICER KIM]: For instance, while you're answering and if you want to stop answering, you have the right to that.
>
> "[DETECTIVE HERNANDEZ]: Do you understand each of these rights that I explained to you?
>
> "[OFFICER KIM]: Do you understand what I just said?
>
> "[APPELLANT]: Yes, yes. [¶] ... [¶]
>
> "[DETECTIVE HERNANDEZ]: [D]o you wish to talk to me?
>
> "[OFFICER KIM]: Do you want to talk about the incident that happened last night? Do you want to talk?
>
> "[APPELLANT]: Sure it's OK."

At the suppression hearing, Officer Kim testified both about appellant's police interview and as an expert on the Cambodian language and culture. Officer Kim testified, inter alia, that he was born in Cambodia, spoke Cambodian on a daily basis in his personal life, and was a "city certified interpreter for the Cambodian language."

Officer Kim was also active in the local Cambodian community, including the Cambodian Reconciliation Committee. Officer Kim explained that people from the Cambodian countryside were generally poor, uneducated, and lacked knowledge of the court system and legal terms. Based on appellant's demeanor and manner of talking, Officer Kim opined that appellant was from such a background. Consequently, in translating the Miranda warnings, Officer Kim tried to use "simple term[s]" he thought appellant would be able to understand. Officer Kim believed all his Cambodian translations would have conveyed to appellant the meaning of what Detective Hernandez was saying.

In denying appellant's suppression motion, the trial court reasoned, in part:

> "I think both counsel are right, that Miranda, it's—it's not a—warning that has to be given verbatim ... nor does it have to be given in English; it has to be given in the language that best communicates to the suspect.... And that's key, because what I heard here was that—... and counsel did remind the court, and that is for the defense, of who this officer was, his background, his respect in the community—I have to make a credibility assessment here too—and Officer Kim made it a point that based on all the circumstances and what he was saying and how he said it, that he was going to communicate these rights to Mr. Sok, and it wasn't a verbatim reading of any card, but it was who was this person, what are the circumstances, I'm going to make sure I interpret in a fashion that communicates these rights to Mr. Sok. While he may have said, 'I don't have any money,' that's why I questioned Officer Kim as to whether or not at that time ... he understood the defendant understood that advisement, and his testimony was, 'yeah, he did,' and if he felt he didn't

6

understand, he would have followed up. Instead, he just told him to 'wait', because ... Detective Hernandez was beginning to give another advisement, and that commentary was going to interfere with him listening to [Detective] Hernandez and making sure he gave the advisement and translated it in the most effective way for Mr. Sok. [¶] Based on all those circumstances, as to the constitutional sufficiency of the advisement, was it adequate, the court finds that it was adequate, it was—and not in any sense deceptive."

**B. Applicable Legal Principles**

In People v. Samayoa (1997) 15 Cal.4th 795, 829–830, 64 Cal.Rptr.2d 400, 938 P.2d 2, the California Supreme Court summarized the legal principles applicable to appellant's claim as follows:

> "In reviewing the trial court's rulings related to this claim, we accept its resolution of disputed facts and inferences, and its evaluations of credibility, if substantially supported [citation], but we independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged confessions were obtained illegally. [Citation.]"'[U]nder the familiar requirements of Miranda, ... a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent.'" [Citations.] This court has observed 'that no particular form of words or conduct is necessary on the part of a suspect in order to invoke his or her right to remain silent' [citation], and the suspect may invoke this right by any words or conduct reasonably inconsistent with a present willingness to discuss the case freely and completely [citation]. [¶] ... [¶] "As the United States Supreme Court has observed, the prophylactic Miranda warnings are '"not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected"' [citation], and the warnings therefore need not be given in the exact form described in that decision [citation]. Thus, a reviewing court need not examine a Miranda warning for accuracy as if construing a legal document, but rather simply must determine whether the warnings reasonably would convey to a suspect his or her rights as required by Miranda. [Citations.]"

**C. Analysis**

In challenging the adequacy of the warnings he received through Officer Kim's translation, appellant seems to suggest that only an exact, literal interpretation of each of the standard warnings read by Detective Hernandez would satisfy Miranda. We disagree with appellant's analysis and conclude Officer Kim's statements, as a whole, adequately conveyed to appellant his rights under Miranda.

As noted above, the United States Supreme Court has "never insisted that Miranda warnings be given in the exact form described in that decision." (Duckworth v. Eagan (1989) 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166, fn. omitted.) The warnings given in this case "touched all of the bases required by Miranda" (Duckworth, at p. 203) and "did not 'entirely omi[t],' ... any information Miranda required them to impart" (Florida v. Powell (2010) —— U.S. ——, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (Powell)). Thus, the present case is distinguishable from the cases on which appellant relies. (See, e.g., United States v. Fox (2nd Cir.1968) 403 F.2d 97, 100 ["Nothing at all was said to [the defendant] about his right to have an attorney appointed prior to questioning if he could not afford one, as Miranda requires"]; United States v. Tillman (6th Cir.1992) 963 F.2d 137, 141 ["Defendant was never told any statements that he would make could be used against him"]; and People v. Bradford (2008) 169 Cal.App.4th 843, 854, 86 Cal.Rptr.3d 866["[I]t was not even hinted to defendant that his statements might later be used against him; the issue was not mentioned at all."].)

Appellant complains Officer Kim's translations of the warnings concerning his right to remain silent were inadequate because they did not expressly advise him that he had the right to remain silent and that anything he said could be used against him in court. However, the totality of the officer's statements expressed the same message. The officer began by advising appellant that before Detective Hernandez talked to him about why he was arrested, the detective would read appellant his rights. Officer Kim added emphasis to this statement by explaining "in America People have rights" and admonishing appellant "so listen." After this prefatory statement, which essentially urged appellant to focus on the rights he was about to hear, Officer Kim advised appellant if he did not want to talk about the incident it was okay, and that the story he told the officers could be shown to the court. These statements, in combination with the later statement advising appellant that "while you're answering and if you want to stop answering, you have the right to that," effectively informed appellant that he had the right (not merely the option) not to answer any questions or say anything to the police if he chose not to.

Furthermore, although Officer Kim did not specifically state that anything appellant told the officers could be used against him in court, Officer Kim, who testified as an expert on Cambodian culture and language, explained that he effectively communicated the same thing to appellant by telling him the story he told the police could be shown to the court. The trial court credited Officer Kim's testimony and appellant presented no evidence to support the contrary interpretation he offers on appeal; namely, that the translation permitted appellant "to suppose that the story he told might be used solely in his behalf."

We similarly reject appellant's claim that he was inadequately advised of his right to counsel because Officer Kim did not specifically "say whether appellant might speak with an attorney before or during the questioning or only after the questioning was over." Officer Kim informed appellant that he could have an attorney with him if he wanted one and that, if he did not have money to pay for an attorney, they would get an attorney to speak with him. The officer did not limit the presence of the attorney to before or during questioning. Thus, the officer's statements effectively "communicated to [appellant] that his right to an attorney began immediately and continued forward in time without qualification." (United States v. Frankson (4th Cir.1996) 83 F.3d 79, 82, [general statement about right to counsel sufficient to satisfy Miranda ]; see also United States v. Caldwell (8th Cir.1992) 954 F.2d 496, 498 [same].)

Our conclusion is unaltered by Powell, supra, ––– U.S. –––, 130 S.Ct. 1195, 175 L.Ed.2d 1009, a recent decision appellant cites in his reply brief. In Powell, law enforcement officers informed the defendant that he had "'the right to talk to a lawyer before answering any of [their] questions'" and "'the right to use any of [his] rights at any time [he] want[ed] during th[e] interview.'" (Id. at pp. 1204–1205.) The Supreme Court determined that the first statement communicated that the defendant could consult with a lawyer before answering any particular question, and the second statement confirmed that he could exercise that right while the interrogation was underway. (Id. at p. 1205.) The Court held that, in combination, the two warnings reasonably conveyed the defendant's right to have an attorney present, not only at the outset of the interrogation but at all times. (Ibid.)

Powell is not directly on point because the warnings given there were worded differently than the warnings at issue here. However, Powell is instructive because it teaches that the failure to explicitly inform a defendant the right to counsel applies both before and during questioning can be cured if the totality of the Miranda warnings reasonably convey this message, as we conclude it did in this case.

We also reject appellant's suggestion that the warnings concerning counsel were somehow inadequate because when appellant commented that he did "not have any money to pay,"

8

> Officer Kim told appellant to "[w]ait" but failed to return to elaborate further on the right to appointed counsel. However, Miranda did not require further elaboration once the right was adequately conveyed, as we have concluded that it was. Moreover, as the trial court observed in its ruling, Officer Kim was examined at length on this issue and explained that he told appellant to wait because appellant and Detective Hernandez were starting to talk over each other. In Officer Kim's opinion, appellant did not seem confused about the advisement but was simply making a general statement of fact when he said he had no money to pay.
>
> After arguing that the Miranda warnings were inadequate, appellant briefly suggests he did not validly waive his rights because he "gave no express waiver of any rights...." Appellant argues that Officer Kim's question, "Do you understand what I just said," was ambiguous because he did not specifically ask appellant whether he understood the rights he had just been read. Because the question was ambiguous, appellant claims his "yes" response was also ambiguous and, therefore, there was no showing he made a knowing and intelligent waiver of his rights. We disagree.
>
> Even assuming appellant's affirmative response did not constitute an express waiver of his Miranda rights, the totality of the circumstances supports a finding that appellant impliedly waived his rights. (Fare v. Michael C. (1979) 442 U.S. 707, 724–725, 99 S.Ct. 2560, 61 L.Ed.2d 197 [court must consider "the totality of the circumstances surrounding the interrogation" when determining whether defendant waived rights].)  After appellant indicated he understood what Officer Kim had just said, Officer Kim asked appellant, "Do you want to talk about the incident that happened last night?  Do you want to talk?"  Appellant responded, "Sure it's OK."  Officer Kim then asked appellant, "Do you know why they detain you?"  Appellant promptly replied, "Because I stabbed my wife, I stabbed my wife and killed her. That's why they arrested me."  Appellant subsequently answered the officer's questions, and the interview transcript contains no sign of confusion, hesitation or reluctance to speak on appellant's part.  (See People v. Sully (1991) 53 Cal.3d 1195, 1233, 283 Cal.Rptr. 144, 812 P.2d 163 [the defendant impliedly waived his Miranda rights when, after having been given those rights, he stated he understood them and proceeded to give a tape-recorded statement to a detective]; People v. Whitson (1998) 17 Cal.4th 229, 250, 70 Cal.Rptr.2d 321, 949 P.2d 18 [decisions of the United States Supreme Court and of the California Supreme court have held that an express waiver of Miranda is not required where a defendant's actions make clear that a waiver is intended]; People v. Cortes (1999) 71 Cal.App.4th 62, 70, 83 Cal.Rptr.2d 519 [implied waiver established when evidence showed that, after officer advised the defendant of his rights and the defendant said he understood them, the defendant gave taped interview].)
>
> For all these reasons, we reject appellant's claim of Miranda error.

(Doc. 21, Ex. A, pp. 35-39).

### 2. Federal Standard.

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself."  A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning.  Miranda v. Arizona, 384 U.S. 436, 469–73 (1966).  In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir.2009).

Once the officer advises the suspect of the Miranda warnings, if he makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois 469 U.S. 91, 98 (1984). See also Miranda, 384 U.S. at 473–74; Michigan v. Mosley, 423 U.S. 96, 100 (1975); DeWeaver v. Runnels, 556 F.3d at 1001. A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, ––– U.S. ––––, ––––, 130 S.Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir.2005) ("In soliciting a waiver of Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights"). A valid waiver of rights may be implied under the circumstances presented in the particular case. Specifically, "a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir.2008) (quoting United States v. Rodriguez–Preciado, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir.2005)). See also Butler, 441 U.S. at 369–73 (waiver of Miranda rights can be inferred "from the actions and words of the person interrogated.").

The Fourteenth Amendment to the United States Constitution demands that confessions be made voluntarily. See Lego v. Twomey, 404 U.S. 477, 483–85 (1972). A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir.1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)). See also Blackburn v.

Alabama, 361 U.S. 199, 208 (1960). An admission is involuntary "if coerced either by physical intimidation or psychological pressure." Mickey v. Ayers, 606 F.3d 1223, 1233 (9th Cir.2010) (citing United States v. Shi, 525 F.3d 709, 730 (9th Cir.2008)).

In determining whether a confession is voluntary, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession" Dickerson v. United States, 530 U.S. 428, 434 (2000). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir.1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). "Coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). Voluntariness is to be determined in light of the totality of the circumstances. Miller v. Fenton, 474 U.S. 104, 112 (1985); Haynes v. Washington, 373 U.S. 503, 513 (1963).

### 3. Analysis.

In its decision, the 5th DCA cited clearly established federal law in Duckworth, that "the United States Supreme Court has 'never insisted that Miranda warnings be given in the exact form described in that decision.'" The appellate court held that Officer Kim's translation of the Miranda rights to Petitioner "as a whole, adequately conveyed to [Petitioner] his rights under Miranda." (Ex. A, p. 38). Moreover, the 5th DCA also concluded that, considering the totality of the circumstances, including the credibility of Officer Kim, Petitioner knowingly and intelligently waived his rights against self-incrimination. (Id.).

To the extent that the trial court's and 5th DCA's ultimate legal conclusions were based upon the factual findings regarding the administration of the Miranda warnings and Petitioner's knowing and intelligent waiver of them, the record clearly establishes that such a decision was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. Nor does this record disclose that those findings were "so clearly incorrect that it would not be debatable among

reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d at 999-1001.  To the contrary, the state court's findings and eventual legal conclusion regarding the Miranda advisement appear to be both reasonable and supported by the evidentiary record.  Indeed, implicit in Petitioner's contention, as the 5th DCA noted, is the mistaken notion that only a literal reading of the Miranda rights will comply with the U.S. Constitution.  As mentioned, however, the U.S. Supreme Court has unequivocally rejected such a contention in numerous prior cases.  Accordingly, the state court's findings and legal conclusions are entitled to full AEDPA deference and will not be disturbed.  Therefore, Petitioner's Miranda claim should be denied.

### B. Appointment of a Third Competency Expert

Petitioner next contends that the trial court erred in appointing a third competency expert after the first two found Petitioner incompetent to stand trial.

#### 1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**Claims Concerning Appellant's Competency to Stand Trial**

Appellant contends: (1) the trial court was unauthorized under the relevant language in section 1369 to appoint a third expert, a psychiatrist, to evaluate him after the first two court-appointed psychologists concluded appellant was not competent to stand trial;  (2) assuming the court did have the statutory authority to appoint a third expert, it abused its discretion in doing so;  (3) insufficient evidence supports the jury's finding that appellant was competent to stand trial; and (4) the trial court erred in refusing defense counsel's pretrial request to appoint doctors to reevaluate appellant's competency.

**A. Procedural Background**

On October 8, 2008, the district attorney filed a complaint charging appellant with the instant offense.

On February 18, 2009, the trial court suspended criminal proceedings and appointed two psychologists, Dr. Laura Geiger and Dr. Harold Seymour, to examine appellant and determine whether he was competent to stand trial. (§§ 1368, 1369, subd. (a).)

On April 1, 2009, the court received the psychologists' reports.  Both concluded that appellant was not competent to stand trial.

On April 29, 2009, the trial court, over defense counsel's objection, appointed a psychiatrist, Dr. Julian Smith, to examine appellant.  The following relevant discussion occurred at the hearing:

> "THE COURT: The court did meet with both counsel in chambers at their request.  I indicated to counsel that given the somewhat unusual circumstances in this case, that I

> believe it would be appropriate for a psychiatrist, as opposed to a psychologist, to do the 1368 evaluation, given that there appear not only mental health issues, but perhaps physical issues that need to be addressed by a medical doctor in assessing the defendant's competency to participate in the proceedings. The court indicated I would be appointing psychiatrist Dr. Julian Smith to do the 1368 evaluation, and then we'll put it over for the report, to be provided to the court and counsel—that we have the report by May 27, with a hearing date of May 28.[¶] ... [¶]
>
> "[DEFENSE COUNSEL]: I would object to the court appointing an additional doctor. 1368 provides for two doctors or psychologists to be appointed. There is no split opinion, so I don't think the court has the authority to appoint a third without grounds.
>
> "THE COURT: And I believe the court does have grounds, given the two reports in this case. I'll point out, there do appear to be medical as well as psychological issues, and I believe the court, in order to make a valid and well-informed assessment of the defendant's competency, needs an expert who's a psychiatrist as opposed to just a psychologist."

In a report dated May 22, 2009, Dr. Smith concluded that appellant did not suffer from a mental disorder rendering him incompetent to stand trial.

The competency trial commenced on September 1, 2009. Dr. Geiger testified for the defense that she examined appellant on March 9, 2009, with the assistance of Cambodian interpreter, Rithy Lim. Dr. Geiger also reviewed appellant's police interviews and jail medical records.

In preparing her report on appellant, Dr. Geiger "ended up diagnosing him with an amnestic disorder, which is a milder form of a memory impairment." Dr. Geiger acknowledged her findings "weren't conclusive" and suggested she would need to obtain more information through further testing to make a definitive diagnosis. However, Dr. Geiger was of the opinion that appellant was not competent to stand trial due to his apparent memory problems, which were reflected in how he expressed himself during the examination.

Dr. Geiger explained that, in discussing his family background, appellant "seemed to have a number of memory gaps." "[A]t one point he said he had five children, and then he ... described just a few minutes later that four children had died, but two were alive." Dr. Geiger tried to administer a standard competency test to appellant but was unable to complete it "because he seemed to have so much difficulty with his memory, was clearly unable to respond to a number of the questions." Dr. Geiger concluded that with the diagnosis of amnestic disorder, "there was a very low probability that he would be able to become trial competent."

Dr. Seymour testified for the defense that he examined appellant on March 19, 2009. Like Dr. Geiger, he was assisted by interpreter Lim. Dr. Seymour also reviewed appellant's police interviews, jail medical records, and the reports prepared by Dr. Geiger and Dr. Smith. Dr. Seymour concluded that appellant suffered from posttraumatic stress disorder (PTSD) and dissociative amnesia, which rendered him incompetent to stand trial.

Dr. Seymour testified the psychiatric records included in appellant's jail medical records supported his conclusion, explaining:

> "The psychiatrist identified symptoms consistent with mood, sleep, and adjustment difficulties, many of which are consistent with the diagnosis that I offered. The psychiatrist also raised some questions early on about the presence of memory difficulties, possibly even dementia."

13

When Dr. Seymour asked appellant about general background information, appellant knew he was accused of killing his wife and was able to provide some details about what happened but could not recall the stabbing itself. Dr. Seymour explained:

> "[Appellant] was able to talk about the fact that they had been having a conflict over the fact that she wouldn't stay with him, he was upset, he had some concern that maybe she was going out on him with somebody else. He remembered going to where she was, he remembered them arguing and it getting kind of heated, and he said he didn't remember much after that."

Respecting the PTSD diagnosis, Dr. Seymour testified that appellant "described being in Southeast Asia ... during the communist rule, and being tortured and beaten a number of times to the point of unconsciousness" and appellant "stated that subsequent to those episodes, he's always had difficulty with his memory." Appellant did not volunteer the information about being beaten until Dr. Seymour specifically asked him at the interpreter's suggestion. Dr. Seymour opined that the beatings appellant suffered were "the initiation of [PTSD]-type symptoms."

Dr. Seymour opined that appellant's memory gaps were consistent with dissociative amnesia, and explained that dissociation is a common symptom of PTSD. Dr. Seymour further testified:

> "The ... difficulty with this one is teasing out to what extent the memory issues are organic and to what extent they're psychological, and so I think there's some combination of both. My suspicion is he does have some kind of ongoing long-term general memory difficulties, but I also think that the loss of some recollection of specifics about the crime, alleged crime, is consistent with maybe a dissociative kind of response."

Dr. Seymour further testified that appellant's psychiatric records indicated that he had preexisting mental health issues predating the current crime by about a decade. The records reflected that appellant was treated in an emergency psychiatric facility in 1998, and was diagnosed with schizophreniform disorder, which occurs at the early stages of schizophrenia. Appellant apparently experienced hallucinations or delusions. A diagnosis of depressive disorder with psychotic features was also considered.

Dr. Smith testified for the prosecution that he examined appellant on May 18, 2009, with the help of an interpreter. Dr. Smith also reviewed the reports of Dr. Geiger and Dr. Seymour, appellant's police interviews and jail medical records, and police reports from the case. Dr. Smith opined that appellant did not have a mental disorder rendering him incompetent to stand trial.

Dr. Smith confirmed that he evaluated appellant for PTSD and psychotic disorders. Dr. Smith ruled out a diagnosis of PTSD because appellant endorsed only one or two symptoms, not the "full gamut of symptoms that would have classified him as ... suffering from [PTSD]." Dr. Smith further observed that appellant did not endorse symptoms consistent with any type of psychotic disorder.

Dr. Smith noticed that, during his interview of appellant, appellant would often answer questions with "I don't know" and then later provide information he previously claimed he did not know. Dr. Smith explained:

> "One of the striking things about the interview was that when he was directly asked about things such as his age, his telephone number, his name, so forth, he was not able to provide answers for that. When I asked questions about whether he was married,

14

whether he had children, again, there was either a denial that he was married, or confusion that he didn't know whether he had children. These were upon direct examination or direct questioning of those specific things. However, later on, or at different points in the interview when I asked other questions, such as, 'where were you living at the time that you were arrested,' he would then state, his children. If I asked about his medical history, he would say, 'well, my wife visited me in the hospital, or she took care of me,' something to that effect ..., but ... those are the types of things that he would say, after he had previously told me that he had never been married or—I think the words he used, 'he had always been alone' is what he said. And in terms of having children, again, he stated that he didn't know whether he had children, and then later on he gave a history that his children had been killed in the war, and then even later on, said that two of his children had visited him in jail, and so that was something that stood out."

In reviewing appellant's police interviews, Dr. Smith observed that appellant provided "a full history regarding his age, children, references to his wife. All sorts of details were provided that ... when he met with me, he claimed that he did not know." In light of this and the cognitive tests he administered to appellant, Dr. Smith did not believe appellant was suffering from "a true memory loss."

Dr. Smith disagreed with Dr. Seymour's diagnosis of dissociative amnesia. Dr. Smith explained that "[d]issociative amnesia is a state where a person will forget events during a very kind of circumscribed period of time, and typically that is associated with trauma, so if there's some type of trauma, they may forget the events that occurred during that time." Dr. Smith observed in Dr. Seymour's report that appellant had reported being tortured by the communists. However, Dr. Smith opined that appellant's reported memory of being tortured did not appear to support a diagnosis of dissociative amnesia based on a traumatic event because dissociative amnesia is a type of memory loss that results in the person being unable to recall directly the traumatic event. Dr. Smith also disagreed with Dr. Geiger's diagnostic impression that appellant was suffering from amnestic disorder.

Dr. Smith testified that the amount of time he spent evaluating appellant (about an hour and 45 minutes) was sufficient for him to diagnose whether appellant was suffering from a mental disorder. The only mental disorder Dr. Smith was able to diagnose in appellant "was alcohol abuse disorder."

The prosecution also called Fresno Police Officer Danny Kim. Officer Kim was born in Cambodia and spoke Cambodian as his first language. He acted as a translator for Detective Raul Hernandez, when Detective Hernandez interviewed appellant regarding the homicide of appellant's wife. During the interview, appellant provided personal information including his name and date of birth in 1940, his address and apartment number, and his telephone number. He also talked about his children and identified them by name.

During the interview, appellant provided a fair amount of detail regarding the killing of his wife, who appellant identified as Boeun Say. Appellant admitted he killed his wife, stabbing her with a knife he always carried around his waist area. When asked why he stabbed his wife, appellant said he went to his wife to ask her to come back home with him. When she refused and said she did not want to be with him anymore, appellant asked her why, if that was the case, she did not tell him "the right thing so we can get rid of paperwork and not be married anymore." Right before stabbing his wife, appellant said, "I don't want anybody to get you, I rather just kill you."

Appellant also reported that it had been his intention to kill himself after he killed his wife, explaining he was embarrassed about his wife cheating on him. Officer Kim confirmed that in

the local Cambodian community, it was a stigma for a man of appellant's age to have his wife cheat on him, and that in such a close community, everyone would find out about it.

Officer Kim asked appellant if he had mental problems in the past. In response, appellant stated his only medical problem was a liver problem, and that he had been in a coma for nine days and nine nights.

The prosecution also called two correctional officers who testified regarding appellant's behavior and demeanor in jail.

On September 2, 2009, the jury returned a verdict finding appellant competent to stand trial.

**B. Appointment of Third Expert**

Appellant contends the trial court had no statutory authority to appoint a third expert (Dr. Smith) to examine him after the first two court-appointed experts (Dr. Geiger and Dr. Seymour) submitted reports finding him incompetent to stand trial.

Section 1369 sets forth the procedures to be followed after counsel or the court, pursuant to section 1368, forms a doubt as to whether the defendant is competent to stand trial. (See People v. Bell (2010) 181 Cal.App.4th 1071, 1079–1080, 105 Cal.Rptr.3d 259.) Section 1369 provides, in part:

> "A trial by court or jury of the question of mental competence shall proceed in the following order: [¶] (a) The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof. One of the psychiatrists or licensed psychologists may be named by the defense and one may be named by the prosecution...."

The parties on appeal agree that this case falls under the first sentence in section 1369, subdivision (a); i.e., "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant." (Italics added.) Appellant contends that under the plain language of this provision, a trial court can appoint no more than two experts because the singular term "expert" is used rather than the plural term "experts." In other words, the court must appoint one psychiatrist or licensed psychologist and may appoint one additional expert but no more. However, "Section 7 provides that, as to words used in the Penal Code, 'the singular number includes the plural, and the plural the singular; ...' 'The rule of construction enunciated in section 7 is no mere rubric—it is the law.' [Citation.]" (People v. Catelli (1991) 227 Cal.App.3d 1434, 1451, 278 Cal.Rptr. 452.) Thus, we must interpret the phrase "any other expert" in section 1369, subdivision (a) to be consistent with "any other experts" to the extent it is practicable. (Catelli, supra, at p. 1451, 278 Cal.Rptr. 452.)

Interpreting the statute in light of section 7, as we must, it is reasonable to construe "any other expert" in the first sentence of section 1369, subdivision (a) as allowing a trial court to appoint as many additional experts as it deems appropriate in a particular case. This interpretation finds support in the Advisory Committee Comment to California Rules of Court, rule 4.130, which states, in pertinent part:

> "Once mental competency proceedings under Penal Code section 1367 et seq. have been initiated, the court is to appoint at least one expert to examine the defendant under

16

> (d). Under no circumstances is the court obligated to appoint more than two experts. (Pen.Code, § 1369(a).)" (Advisory Com. com, 23 Pt. 1B West's Ann.Codes, Rules (2011 ed.) foll. rule 4.130, p. 193, italics added.)
>
> Advice that a court is not obligated to appoint more than two experts would be unnecessary if the contested language in section 1369, subdivision (a) was understood as restricting a court's appointment to two experts. We are also unpersuaded by appellant's argument that, assuming the trial court had discretion to appoint a third expert, it abused its discretion in doing so. The crux of appellant's argument is that the appointment must have been pretextual because there was no reason to appoint an additional expert since the first two experts were in agreement that appellant was not competent to stand trial. The record, however, supports the trial court's stated reason for appointing a psychiatrist to evaluate appellant. The psychologists' reports both contained references to possible organic causes of appellant's apparent memory loss, upon which their findings of incompetency were largely based. In light of this information, the trial court reasonably concluded that it would be useful to obtain the additional opinion of a psychiatrist with a medical degree. There is no indication the court had reason to believe, in advance, that the particular psychiatrist it appointed would reach a different conclusion concerning appellant's competency than the two psychologists who initially evaluated him. We therefore reject appellant's unfounded assertion the court appointed the psychiatrist merely to obtain "an opinion on which a jury could base a finding that appellant was competent."

(Doc. 21, Ex. A, pp. 30-34).

### 2. Federal Standard.

A defendant is competent to stand trial if he understands the proceedings and is able to assist his attorney in his own defense. See Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Under the federal standard, competency to stand trial requires "the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping to prepare an effective defense." Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir.2001) (citing Dusky, 362 U.S. at 402). Under California law, a criminal defendant is mentally incompetent to stand trial if, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

Convictions of legally incompetent persons violate due process, and where the evidence raises a bona fide doubt about the defendant's competency, due process requires that a full competency hearing be conducted. Pate v. Robinson, 383 U.S. 375 (1966). However, such a hearing is not required absent a "substantial" or "bona fide" doubt as to the defendant's competence. Hernandez v. Ylst, 930 F.2d 714, 716 (9th Cir.1991). A habeas petitioner is entitled to such a hearing if he presents

sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court. Steinsvik v. Vinzant, 640 F.2d 949, 954 (9th Cir.1981). Thus, a showing of "either extremely erratic and irrational behavior during the course of the trial" or "lengthy histories of acute psychosis and psychiatric treatment" may suffice to establish incompetency to stand trial. Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir.1985).

In California, the trial court is required to conduct a competency hearing if defense counsel informs the court that he or she believes the defendant may be mentally incompetent. § 1368, subd. (b). California law provides that the court must conduct a competency hearing on its own motion if there is evidence that raises a reasonable doubt on the issue. People v. Howard, 1 Cal.4th 1132, 1163 (1992). Once a competency hearing has been held, however, the court is not obligated to conduct a second competency hearing unless "it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of" its finding of competence after the first hearing. People v. Jones, 53 Cal.3d 1115, 1153 (1991). This is a high hurdle: "[O]nce a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." People v. Marks, 31 Cal.4th 197, 220 (2003). In applying these standards, the state court will bear in mind that "[r]eviewing courts give great deference to a trial court's decision whether to hold a competency hearing." Id.

   3. Analysis.

Preliminarily, it bears emphasis that the gravamen of Petitioner's claim is not that he actually was incompetent to stand trial, but, rather, that the trial court improperly applied state law in appointing Dr. Smith to evaluate him and testify at the competency hearing. Although one may infer that the claim's underlying premise is that Petitioner was indeed incompetent, and although Petitioner sought to raise various other competency-related issues in state court, the only competency-related claim that was both exhausted in the California Supreme Court and raised in the instant petition is the claim that the trial judge improperly applied state competency laws. Thus framed, it is clear that this contention is not cognizable in federal habeas proceedings.

Generally, issues of state law are not cognizable on federal habeas review. Estelle v. McGuire,

502 U.S. 62, 67 (1991)("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993)(O'Connor, J., concurring)("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").  Indeed, a determination of state law by a state appellate court is binding in a federal habeas action,  Hicks v. Feiock, 485 U.S. 624, 629 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in de novo review); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).  A federal court has no basis for disputing a state's interpretation of its own law. Clemons v. Mississippi, 494 U.S. 738, 739–740 (1990).

Since no federal dimension to this issue has been both exhausted in state court and properly raised in the instant petition, the claim rests squarely upon the state court's interpretation of §§ 1368 and 1369.  The 5th DCA took pains to carefully consider and construe the language in the state law and concluded that the trial court's decision to appoint Dr. Smith was in compliance with applicable statutes.  That being the case, there is nothing left for this Court to review since, as stated previously, this Court is bound by the state court's interpretation of its own laws.  Hicks v. Feiock, 485 U.S. at 629; Lewis v. Jeffers, 497 U.S. at 780.  For these reasons, the claim should be denied.[2]

### **RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days** after being served with a copy, any party may file written objections with the court and serve a

---

[2] Additionally, and perhaps unnecessarily, as Respondent argues, since Petitioner does not allege a violation of a federal constitutional right by the state court's application of state law, no "clearly established federal law" has been articulated that would justify habeas relief. 28 U.S.C. § 2254(d).

1  copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings
2  and Recommendation." Replies to the objections shall be served and **filed within 10 days** (plus three
3  days if served by mail) after service of the objections. The Court will then review the Magistrate
4  Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file
5  objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez
6  v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

7

8  IT IS SO ORDERED.

9     Dated:   **March 21, 2016**                    **/s/ Jennifer L. Thurston**
10                                                   UNITED STATES MAGISTRATE JUDGE